MOSES KEOKUK v. D. S. ULAM, *as Treasurer*, C. F. PARKER, *as Sheriff*, AND THE BOARD OF COUNTY COMMISSIONERS OF LINCOLN COUNTY.

TAXATION—*Personal Property of Indians Taxable, When.* When an Indian tribe is located upon a reservation by the government of the United States under a treaty which does not provide that the reservation shall not be included within territorial or state jurisdiction, and the reservation is afterward included within an organized county and territory, and the tribe surrenders its interest in its reservation, and the several members of it take allotments, they become residents of the territory and county, and are persons in contemplation of law, and their personal property is subject to assessment and taxation by the proper authorities of the county in which they reside.

*Error from the District Court of Lincoln County.*

*L. E. Payne, H. R. Thurston* and *J. F. Stone*, for plaintiff in error.

*Frasier & Newby*, for defendants in error.

The opinion of the court was delivered by

McATEE, J.: Plaintiff in error, plaintiff below, is an Indian of the Sac and Fox tribe, and the reservation provided for that tribe by the United States by treaty proclaimed October 14, 1868, was included within the boundaries of Oklahoma Territory by the Organic Act, passed by congress May 2, 1890, and is within the county of "A," now Lincoln county, from the district court of which the case comes here. The tribe took their land by allotment under the act of congress passed in pursuance of an agreement made by it with the United States June 10, 1890. Personal property of plaintiff in error, consisting of two horses valued at $50, one pleasure carriage

valued at $35, household goods valued at $30, money, $2,000; total, $2,115, was located upon the agency quarter section of the reservation, and was listed for taxation in 1892 by the assessor of Kickapoo township, within which that quarter section lies.

The amount of taxes found to be due thereon for that year was $94.85, and this was the sum remaining unpaid. The treasurer of the county issued his delinquent tax warrant to the sheriff of Lincoln county, commanding him to levy the said sum with costs out of the personal property of plaintiff in error.   The levy of said sum was thereupon made by the sheriff upon the personal property of plaintiff in error, which had been listed for taxation.   The complaint of plaintiff in error was thereupon filed in the district court of Lincoln county, asking for a restraining order, and that upon a final hearing an injunction should be granted perpetually restraining the defendants in error from the collection of said taxes.

The defendants filed their demurrer to said complain† as not stating facts sufficient to constitute a cause of action.   A hearing was had by the district court and the demurrer was sustained.   Plaintiff in error brings the case here for review, assigning error:

1.   That the court erred in holding that the quarter section of land known as the Sac and Fox Agency is not ceded Indian land but that it is a part of Lincoln county.

2.   In holding that personal property on unceded Indian lands can be assessed and taxed by the authorities of Lincoln county.

The United States acquired title to the lands of the Indian Territory by the Louisiana purchase.

The interest of the Sac and Fox Indians in the lands in question was acquired by treaty between the United States and that tribe proclaimed October 14, 1868, to be

found in revision of Indian Treaties, pp. 767-775. By this treaty the tribe ceded to the government of the United States a quantity of land with improvements thereon located in the state of Mississippi.

By the third article thereof "the United States agree to pay to the Sac and Fox Indians at the rate of one dollar an acre for the whole cf the land ceded in the two preceeding sections, being about 157,000 acres, less the amount of land set apart for individuals; and further agree to pay the outstanding indebtedness of the said tribe, amounting to $26,574, and interest thereon out of the proceeds of the sale of the land ceded in this treaty, and after deducting such sums as under the provisions of the treaty are to be expended for their removal and the expenses of establishing them in their new country, to add the remainder to their vested funds and to pay them five per cent. interest thereon."

By the sixth article of said treaty the United States agreed "in consideration of the improvements upon said reservation, to give to the Sacs and Foxes, for their future home, a tract of land in the Indian country south of Kansas and south of the Cherokee lands, not exceeding 750 square miles in extent."

The tract of land therein provided for was selected in the manner provided for by the treaty, and included the section and quarter section of land herein mentioned.

By article nine of said treaty it was provided that "in order to promote the civilization of the tribe one section of land convenient to the residence of the agent shall be selected by said agent with the approval of the commissioner of Indian affairs and set apart for a manual labor school; and there shall also be set apart from the money to be paid the tribe under this treaty the sum of $10,000 for the erection of the necessary school buildings and

dwellings for the teachers and the annual amount of $5,000 shall be set apart from the income of their funds after the erection of the school building for the support of the school," etc.

The agreement here made on behalf of the United States was that "in consideration of the improvements upon said reservation, to give to the Sacs and Foxes for their future home a tract of land in the Indian country," etc. Was it meant by this agreement to grant the land and thus convey and pass the title from the United States to the Sac and Fox tribe of Indians? Was it intended and here provided that the United States should patent the land in fee simple to this tribe? The provision in the treaty is, that the tribe shall have the tract of land "for a future home."

We understand the words "for future home" to be words of limitation. The United States did not agree in the treaty to grant the absolute ownership of the land or to execute a patent for it by which the conveyance should be made. The contract is for the use of the reservation for a specific purpose.

In treating with Indian tribes the government of the United States has well known how to provide for their benefit, and the making of a grant in fee simple on the one hand, or on the other hand for a provision which should entitle them to the use and occupation of the reservations for the purpose of, and while they were needed for homes, only. When it was the purpose of the government to stipulate for the conveyance of a fee simple title and for the execution of a patent therefor, that purpose was manifested in other appropriate and unmistakeable terms.

The United States made the latter provision in the eleventh article of the same treaty. Several individual

members of the Sac and Fox tribe had owned lands in fee simple, and had made improvements upon them in the reservation in this city ceded to the United States by that treaty, in order to compensate these individuals for the improvements and interests theretofore held in private ownership, it was provided in article eleven that "George Powers, the present government interpreter, for valuable services rendered and uniform kindness toward the nation, shall have patented to him in fee simple 320 acres of land to be selected by the agent;" *    *    * and similar provisions being made for the benefit of other individual members of the tribe it further provided "that upon the approval of the secretary of the interior after such selections and on payment therefor as hereinbefore provided, patents in fee simple shall be issued to the respective parties, their heirs and assigns."

And it is also provided by article twelve that "in consideration of the faithful services of Samuel Black in protecting their houses and timber from trespass and depredation, there shall be patented to him in fee simple a tract of land upon which he lives," and it was by article seventeen provided that "half breeds and full bloods of the tribe who were entitled to selection of land under the Sac and Fox treaty ratified July 9, 1860, and which selections have been approved by the secretary of the interior, shall be entitled to patents in fee simple for the land heretofore selected according to the schedule annexed to this treaty."

It will therefore be seen that while the United States government, in the exercise of its treaty making power, held in its hand and in full view and gave to particular individuals grants or portions of the reservation in fee simple. it carefully provided for the whole tribe that the tract of land then provided for was given for their future

home only; and if it had been intended by the terms of
article three of the treaty of 1868 to stipulate for the
conveyance of any interests in the land itself other than
the use of it for a future home, such a purpose and such
a conveyance would have been inconsistent with the
subsequent stipulations that certain private individuals
of the tribe should have grants to themselves individually
of portions of the same land.

And it was not the policy nor was it the practice of
the United States to convey the title and absolute estate
and ownership of any land upon which it located tribes
of Indians, while those tribes sustained only the tribal
relation and tribal government, and good reasons existed
therefor. While the tribe remained under the elemen-
tary and rude organizations of the savage state they were
not considered competent either to receive or to execute
grants of land; and neither stipulations for such convey-
ances by the United States of the fee simple title nor
conveyances themselves to lands can be found among the
treaties executed by the United States government to
such Indian tribes. A contrary policy was adopted with
the five civilized tribes. These tribes have each long ago
adopted forms of constitutional government having each
elective executive head, a dual legislature and a judiciary
system with superior and inferior courts, and with each
of them the United States has treated in a different man-
ner with reference to the title to lands negotiated for by
them. The Creeks, Cherokees, Chickasaws, Choctaws,
and Seminoles each hold their lands by "grants," by sol-
emn guarantees of patent by grants in fee simple and by
patents solemnly executed conveying to them their lands
in fee simple.

When the Sac and Fox tribe sold its land in Missis-
sippi and agreed that the United States should keep the

proceeds of such sale in trust for them and pay to it a certain sum as interest upon those proceeds, and it was allotted a location for a home in the Indian Territory, the tribe did not buy the new reservation. The proceeds of their former reservation are still held for them in trust by the United States. Their location upon this land was conceded to them for a future home, the only consideration therefor being the loss of such improvements as they had made upon the reservation in Mississippi.

This particular tract of land then given to them for a home could not be taken away from them without their consent so long as they used it for the specified purpose, but the title remained in the United States.

When, therefore, articles of agreement were made and entered into at the seat of government of the Sac and Fox nation in the Indian Territory on the 10th day of June, 1890, by the United States commissioners and the Sac and Fox tribe, it was provided by article one of that treaty "that the said Sac and Fox nation hereby cedes, conveys, transfers, surrenders and forever relinquishes to the United States of America all their title, claim, or interest of every kind or character in and to the therein described tract of land in the Indian Territory," and when it was "further provided, however, that the quarter section of land on which is now located the Sac and Fox Agency shall not pass to the United States by this cession, conveyance, transfer, surrender and relinquishment, but shall remain the property of said Sac and Fox nation to the full extent that it is now the property of said nation, subject only to the rights of the United States, therein by reason of said agency being located thereon, and subject to the rights, legal and equitable, of those persons that are now legally located thereon," and when it was agreed "that the national council of the said Sac

and Fox nation should have the right at any time    *    *
to sell and convey said quarter section of land, or any
part thereof, saving in such conveyance the rights of the
United States and of persons legally located thereon, for
the benefit of said Sac and Fox nation, but not subject to
be taken by any citizen of the Sac and Fox nation in
allotment, nor subject to homestead entry under any law
of the United States," and when it was provided further
that the "said Sac and Fox nation might be released from
the operation of that part of the agreement one or more
quarters of the said 'school section of land'" the commis-
sioners of the United States did not and could not
thereby enlarge the estate of the Sac and Fox tribe to
the said quarter section of land.   And notwithstanding
either provision " that the Sac and Fox nation hereby
cedes," and "that the quarter section of land upon which
the Sac and Fox agency is located shall not pass to the
United States by this cession," etc., and notwithstanding
their agreement with the Sac and Fox nation that it
should have the right to "sell and convey" said quarter
section of land, said stipulations had no further or other
effect upon the estate in the land, as it then existed, than
to concede to the Sac and Fox nation the privilege and
right to retain or to sell such interests as it had by the
treaty of 1868 in the said quarter section "to the full
extent that it is now the property of said nation," so that
if the Sac and Fox tribe did not own the absolute estate
in, and have the title to the said quarter section of land
before this treaty, neither did the tribe have it afterward.
And if the tribe's interest in the land was merely for the
purpose of a future home prior to the making of the
treaty of June 10, 1890, that, and no greater, was its
interest after the making of the treaty; and accordingly,
when congress ratified the treaty, it did not acknowledge

the sole title and ownership of this Sac and Fox quarter section of land to be in the Sac and Fox nation of Indians as is contended by plaintiff in error.

The United States conveys title to its lands in a different manner; never by inference or implication. No instance can be found in which the lands of the United States have been conveyed to any Indian tribe, except under and in pursuance of a treaty by which the United States has agreed to grant the land and execute a patent for it, and in pursuance of which treaty a grant of the land by patent has been executed by the president of the United States, after having been fully authorized to do so by act of congress, and in which by the terms of the patent the lands have been actually granted by metes and bounds. This, as has been seen, is not such a case.

The land is, therefore, land belonging to the United States. Even if the land was the land of the Sac and Fox tribe, there is no clause in the treaty of October 14, 1868, setting it apart and giving it to the tribe for a future home, by which it was provided that this land shall not be included within the limit of any territorial or state jurisdiction. And it is expressly held in *Langford v. Montieth*, 102 U. S. 96-107, affirming *Harkness v. Hyde*, 98, U. S. 476, "that where no such clause or language equivalent to it is found in a treaty with any Indian tribe within the exterior limits of Idaho, the land held by them is a part of the territory and subject to its jurisdiction so that process may run there, however the Indians themselves may be exempt from that jurisdiction."

Congress had therefore full and complete authority to provide as it did in § 1 of the Organic Act of this Territory that "all that portion of the United States now known as the Indian Territory within which the land in

question was included " is hereby erected into a tempo-
rary government by the name of the Territory of Okla-
homa and to extend the jurisdiction of its courts and the
powers of legislation and of the execution of the laws
over the lands of this territory, and to concede any por-
tion of those powers and of that jurisdiction to the terri-
torial government, and to provide as it did in the Organic
Act, §6, that " all property subject to taxation shall be
taxed in proportion to its value." And the territorial
legislature was authorized to provide, as it afterward did
provide, upon the subject of revenue, as follows, Statutes
of Oklahoma, 1893, ch. 70, §1: "All property, whether
real or personal, all monies, notes, credits or investments
in bonds or stocks, owned by joint stock companies or
otherwise of persons residing in this territory, *  *
shall be entered on the list of taxable property for that
purpose in the manner prescribed by this act."

In the absence of treaty or other express exclusion the
different Indian reservations become a part of the terri-
tory and are subject to territorial legislative jurisdiction,
subject, however, to the power of the general government
to make regulations respecting the Indians. A neces-
sary part of the power and jurisdiction of the territorial
government and of the counties into which it has been
divided is the power to levy taxes for the payment of the
expenses and for the support of such part of the territo-
rial and county government as is now provided for by the
general government. The power is essential to the ex-
istence of the government and to the protection of per-
sons and property within its limits. The plaintiff in
error enjoys that protection. He no longer holds in
common with his tribe a temporary location upon a tract
of land, the title to which is in the general government; he
has been provided with the right to take a portion of that

reservation in severalty and to become the owner of it in fee simple. The tribe in which he was included has surrendered its tribal relation. He has become a resident of the United States and of the Territory of Oklahoma. He no longer depends upon the feeble support of his tribe for the preservation of his rights of person and property. He is no longer subject to its regulations. He is now surrounded with the protections of the law and entitled to the benefits of the new order of things. He has the right in common with other citizens to use the public schools for his children if he has any; and if his family becomes indigent they are entitled to the aid of the territory and county in such alms houses as may be established for the unfortunate poor of the county. If insanity should afflict him he will be provided under the law with the provision made for the insane. When roads and bridges are built they will be for his use. Courts are held into which he may come for the redress of any wrongs which may be inflicted upon him. He is a "person" in the contemplation of law. He may sue and be sued. (Code of Civil Procedure, ch. 66, §§ 3907, 3908; *Fellows v. Blacksmith*, 19, How. 366; *Pka-o-wah-asb-kum v. Sims*, 8 Fed. Rep. 740; *Wau-pe-neav-qua v. Aldrich*, 28 Fed Rep. 489; *Swartzel et al. v. Rogers*, 3 Kan. 372; *Wiley v. Keokuk*, 6 Kan. 94; *Wiley v. Mans-to-wab*, 6 Kan. 111; *Lowry v. Weaver*, 4 McLean, 82; Const. of U. S. Art. 1, Sec. 2; *Elk v. Wilkins*, 112, U. S. 112.)

If the property sought to be taxed in this action is stolen he may apply to the legally constituted authorities for its recovery, and again for the punishment of the offender; he will doubtless do so, but he has corresponding duties. He must not throw all of the burden of these new benefits upon his other fellow citizens; they are

provided for by contribution made by the representatives of the public interests for the public good.

These contributions are taxes and the method which has been found most appropriate to insure that the burdens of their payment shall be equally borne is called taxation, and the plaintiff in error is subject to the obligation imposed by this system.

Our attention has been called to no exemptions to which he is now entitled and we are not acquainted with any provision of the law by which he is exempt from these obligations. The title to the land upon which his property is located is in the United States. Even if it were in the Sac and Fox tribe of Indians there is no provision in the treaty by which it is plain he is exempt from that jurisdiction of the Territory of Oklahoma and the county of Lincoln, under which process runs from the courts and under which taxes are levied and their collection enforced.

The quarter section of land known as the Sac and Fox Agency is a part of Lincoln county and is subject to the jurisdiction of the United States and of the Territory of Oklahoma and of that county as to the power to assess and collect taxes upon personal property which is situated thereon and belonging to a person who is a resident in the said county.

The judgment of the lower court is affirmed.

Bierer, J., having presided in the court below, not sitting; all the other Justices concurring.